Filed 10/26/22

# CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF
CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| COUNCIL FOR EDUCATION AND RESEARCH ON TOXICS,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>STARBUCKS CORPORATION et al.,<br><br>    Defendants and Respondents. | B309227/B310481<br><br>(Los Angeles County Super. Ct. No. BC435759) |

APPEALS from a judgment and orders of the Superior
Court of Los Angeles County, Elihu M. Berle, Judge.
Affirmed in part and reversed in part.

Metzger Law Group, Raphael Metzger and Scott P. Brust for Plaintiff and Appellant Council for Education and Research on Toxics.

Gibson, Dunn & Crutcher, Daniel M. Kolkey, Theodore J. Boutrous, Jr., Patrick W. Dennis, Perlette M. Jura, Blaine H. Evanson and Alexander P. Swanson; Morrison & Foerster and James Schurz for Defendants and Respondents Apffels Coffee, Inc.; Quarter G, Inc.; Brad Barry Company, Ltd.; Caffe Calabria; Caffe Ibis, Inc.; Caribou Coffee Company, Inc.; Cascade Coffee, Inc.; Central Coast Coffee Roasting Co., Inc.; The Coca Cola Company; Coffee Bean International, Inc.; Coffee Roasters of Arizona, Inc.; Community Coffee Company, Inc.; Copper Moon Coffee, LLC; Dona Mireya, Inc.; Eight O'Clock Coffee Company; Equator Coffee & Teas; F. Gavina & Sons, Inc.; Falcon Trading Company, Inc.; Godiva Chocolatier, Inc.; Gold Medal Products Co.; Illy Caffe North America, Inc.; Intelligentsia Coffee & Tea, Inc.; International Coffee & Tea, LLC; James C. Cannell Coffees, Inc.; JBR, Inc.; The J.M. Smucker Company; Kauai Coffee Company LLC; Keurig Dr Pepper; The Kraft Heinz Company; Lavazza Premium Coffees Corp.; Massimo Zanetti Beverage USA, Inc.; Mayorga Coffee, LLC; Melitta U.S.A., Inc.; Montana Coffee Traders, Inc.; Mother Parkers Tea & Coffee, Inc.; Napa Valley Coffee Roasting Company, LLC; Nestle USA, Inc.; New England Partnership, Inc.; Paradise Beverages, Inc.; Peerless Coffee Co., Inc.; Peet's Operating Company, Inc.; Quartermaine Coffee Roasters; Regal Commodities; Rowland Coffee Roasters, Inc.; S & D Coffee,

Inc.; Sara Lee Corporation; Smucker Foodservice, Inc.; Southern Wine and Spirits of America, Inc.; Starbucks Corporation; Starbucks Holding Company; Steep & Brew, Inc.; Verve Pacific Avenue Café, LLC; Victor Allen's Coffee, LLC; Vilore Foods Company, Inc.; and Zavida Coffee Company, Inc.

Varner & Brandt, Richard D. Marca, and Angelica Acosta Samaniego for Defendant and Respondent Stater Bros Markets.

O'Melveny & Myers, Dawn Sestito, Adam Levine, and Kate Ikehara for Defendants and Respondents Trader Joe's Company and Mountanos Brothers Coffee Company.

Blaxter Blackman and J.T. Wells Blaxter for Defendants and Respondents Whole Foods Market California, Inc.; Allegro Coffee Company.

Bryan Cave Leighton Paisner and Megan Irwin for Defendant and Respondent Kerry Inc.

Aronowitz Skidmore Lyon, Lawrence E. Skidmore Kathleen C. Lyon, and Erin J. Tognetti for Defendant and Respondent L. Paul Phillips.

Arnold & Porter Kaye Scholer, Trenton H. Norris and Brian K. Condon for Defendant and Respondent Dunkin' Brands, Inc.

Rogers Joseph O'Donnell, Renee D. Wasserman, and Alecia Cotton for Defendants and Respondents Costco Wholesale Corporation and Bristol Farms

Nixon Peabody, Gregory P. O'Hara and Lauren M. Michals for Defendants and Respondents Ralphs Grocery Company and The Kroger Co.

Norton, Rose Fulbright US, Jeffrey B. Margulies, and Lauren Shoor for Defendants and Respondents Target Corporation; Safeway Inc.; Albertsons LLC; Sprouts Farmers Markets LLC; Reily Foods Company; H.N. Fernandez, Inc.

Pillsbury Winthrop Shaw Pittman, Thomas L. Van Wyngarden, and Stephanie Angkadjaja for Defendants and Respondents Wal-Mart Stores, Inc. and Sam's West, Inc.

Rob Bonta, Attorney General, Edward H. Ochoa, Senior Assistant Attorney General, and Laura J. Zuckerman and Tatiana K. Gaur, Deputy Attorneys General, for California Office of Environmental Health Hazard Assessment as Amicus Curiae.

---

## INTRODUCTION

The Council for Education and Research on Toxics (CERT) brought these actions under Proposition 65[1] (Prop. 65) against respondents, dozens of companies that roast, distribute, or sell coffee.[2] CERT claimed that respondents

---

[1] The Safe Drinking Water and Toxic Enforcement Act of 1986. (Health & Saf. Code, § 25249.5 et seq.)

[2] "Proposition 65 prohibits any person, in the course of doing business, from knowingly and intentionally exposing any
(*Fn. is continued on the next page*.)

4

had failed to provide required Prop. 65 warnings for their coffee products based on the presence of acrylamide, which is included in the Prop. 65 list of known carcinogens and is naturally produced in coffee as a result of the roasting and brewing processes.

While the litigation was pending, the Office of Environmental Health Hazard Assessment (the Agency), charged with implementing Prop. 65, adopted a new regulation providing that "[e]xposures to chemicals in coffee, listed on or before March 15, 2019 as known to the state to cause cancer, that are created by and inherent in the processes of roasting coffee beans or brewing coffee do not pose a significant risk of cancer." (Cal. Code Regs., tit. 27, § 25704; the Coffee Regulation.) This regulation meant that coffee generally did not require Prop. 65 warnings. Respondents then moved for summary judgment, asserting the Coffee Regulation as a defense, while CERT moved for summary adjudication, challenging the regulation's validity on various grounds. In opposing summary judgment, CERT also contended that regardless of the regulation, triable issues remained regarding the presence of acrylamide resulting from additives (plant roots, nuts, and seeds) in some coffee products, which the regulation did not address. It requested a continuance to conduct discovery regarding

_____

individual to a chemical known to the state to cause cancer or reproductive toxicity without giving a specified warning, . . . except as specified. (§ 25249.5 et seq.)" (*DiPirro v. American Isuzu Motors, Inc.* (2004) 119 Cal.App.4th 966, 969-970.)

additives in respondents' products. The trial court denied CERT's motions and granted summary judgment for respondents, concluding that the Coffee Regulation was valid and dispositive of CERT's actions, and that claims regarding additives were outside the scope of the actions.

After the court entered judgment for respondents, CERT moved to recover attorney fees from some of the respondents, on the basis that its litigation efforts catalyzed those respondents to post Prop. 65 warnings voluntarily during the pendency of its actions. The trial court denied CERT's motion, concluding it was ineligible for fees because it had lost its case on the merits and conferred no significant benefit on the public.

As relevant here, a few of the respondents (Starbucks Corporation, Starbucks Holding Company, Seattle Coffee Company, Peet's Operating Company, and Dunkin' Brands, Inc.; the Section 998 respondents) sought an award of costs under Code of Civil Procedure section 998 (section 998), based on compromise offers CERT had rejected during the litigation. CERT moved to tax costs, contending, inter alia, that the offers were invalid because they were conditioned on court approval (as required by Prop. 65), and because the releases they included were overbroad. The trial court denied the motion to tax costs and awarded the relevant respondents almost $700,000 in post-offer costs.

In these consolidated appeals, CERT challenges the trial court's grant of summary judgment for respondents, its denial of its motion for fees, and its award of section 998

6

costs. As to summary judgment, CERT contends the Coffee Regulation was arbitrary and capricious because: (1) the Agency failed to explain its departure from a prior position expressed in a 2005 report; (2) the Agency's Final Statement of Reasons in support of the regulation failed to address CERT's objection relating to the claimed departure; (3) the regulation is underinclusive and thus is not supported by its rationale; and (4) the regulation is scientifically unsupported.[3] CERT also contends that triable issues remained as to acrylamide from coffee additives, and that the trial court should have granted a continuance for additional discovery on these issues. As discussed below, we conclude the regulation was validly adopted, and that claims regarding coffee additives are beyond the scope of CERT's actions. Summary judgment was therefore appropriate.

Challenging the denial of attorney fees, CERT reiterates its position that it was entitled to fees based on the voluntary warnings provided by the relevant respondents. We agree with the trial court that in light of the Coffee Regulation, these temporary warnings proved unnecessary and therefore conferred no significant benefit on the public, rendering CERT ineligible for fees.

Finally, as to the award of costs to the section 998 respondents, CERT contends their compromise offers were invalid because: (1) settlement offers in Prop. 65 cases can

---

[3] With our permission, the Agency filed an amicus brief in support of affirmance.

7

never be valid under section 998, as they require court approval; and (2) the relevant respondents' offers included overly broad releases. We agree that the releases in the section 998 offers were overbroad and thus rendered the offers invalid. Accordingly, we reverse the trial court's denial of CERT's motion to tax costs.

## BACKGROUND[4]

### A. CERT's Pre-Suit Notices and Actions

In 2010, CERT sent two sets of notices of violations under Prop. 65 to numerous companies that roasted, distributed, or sold coffee in California.[5] CERT's notices alleged that the companies had failed to warn that their coffee products exposed Californians to high levels of acrylamide, a chemical included in Prop. 65's list of known carcinogens. (Office of Environmental Health Hazard Assessment, The Proposition 65 List, at <https://oehha.ca.gov/proposition-65/proposition-65-list> [as

---

[4] We deny CERT's motions for judicial notice and augmentation of the record as either irrelevant or unnecessary.

[5] As discussed below, any person may bring an action under Prop. 65 "in the public interest" (Health & Saf. Code, § 25249.7, subd. (d)), provided they first give notice of the claimed violations to the alleged violator, the Attorney General, and others (*id.*, § 25249.7, subd. (d)(1)). A person who violates Prop. 65 is subject to civil penalties of up to $2,500 per day for each violation (*id.*, § 25249.7, subd. (b)(1)), and a person who is suing under Prop. 65 in the public interest is entitled to 25 percent of the penalties collected (*id.*, § 25249.12, subd. (d)).

of Oct. 24, 2022].)  One set of notices alleged that "[e]xposures to acrylamide unavoidably occurred via ingestion whenever a consumer purchased and thereafter consumed the coffee produced, distributed, and/or sold by the above named entities."  The other set, targeting the relevant companies' "ready-to-drink coffee," similarly alleged that "[e]xposures to acrylamide unavoidably occurred via ingestion whenever a consumer purchased and thereafter consumed the above named entities' ready-to-drink coffee."

CERT subsequently filed two actions under Prop. 65 against the previously noticed companies, repeating the essential allegations in its pre-suit notices.  The actions were consolidated, and the matter proceeded through various phases of a bifurcated trial.

### B. Trial Phases 1 and 2

At phases 1 and 2 of the trial, the court rejected multiple affirmative defenses asserted by respondents.  The court also granted CERT's motion for summary adjudication, concluding it had established its prima facie case against most of the respondents, who had stipulated to facts that supported CERT's prima facie case.  The matter was scheduled to proceed to a remedies phase in October 2018.

### C. The International Agency for Research on Cancer Monograph

On June 13, 2018, the International Agency for Research on Cancer (IARC) -- an authoritative body for the

9

identification of chemicals causing cancer under Prop. 65 (Cal. Code Regs., tit. 27, § 25306, subd. (m)(1)) -- released a 501-page monograph on the cancer risks of coffee consumption (the Monograph).  Based on "more than 1000 observational and experimental studies," the Monograph found there was "*inadequate evidence* in humans and experimental animals for the carcinogenicity of coffee drinking."[6]  The document acknowledged that a working group in 1991 had found that coffee caused cancer of the urinary bladder, but explained that the new working group focused on higher-quality epidemiological studies, which showed no consistent association, and suggested that the prior association observed in some studies was "probably due to inadequate control for the confounding effects of tobacco smoking."

The Monograph continued: "In considering the data now available for more than 20 other cancer sites in humans, the Working Group found *evidence suggesting lack of carcinogenicity* for cancers of the female breast, uterine endometrium, prostate, pancreas, and liver, and *inadequate evidence* in humans for cancers at all other sites.  The Working Group's review of other relevant data found *strong*

---

[6]     The Monograph elsewhere defined the phrase "*Inadequate evidence of carcinogenicity*" as denoting that "[t]he available studies are of insufficient quality, consistency or statistical power to permit a conclusion regarding the presence or absence of a causal association between exposure and cancer, or no data on cancer in humans are available."

*evidence* in humans that coffee has antioxidant effects. As a result of this re-evaluation, the Working Group concluded that drinking coffee is *not classifiable as to its carcinogenicity to humans . . . .*" The document additionally noted that "[i]nverse associations with drinking coffee have been observed with cancers of the liver and uterine endometrium," suggesting that coffee reduced the risks of those cancers.

### D. Adoption of the Coffee Regulation

#### 1. Proposed Regulation and Initial Statement of Reasons

On June 15, 2018, shortly after the IARC released its Monograph, the Agency published a notice of its intent to adopt a new regulation, to provide that "[e]xposures to listed chemicals in coffee created by and inherent in the processes of roasting coffee beans or brewing coffee do not pose a significant risk of cancer."[7] (Underlining omitted.) That same month, the Agency issued an Initial Statement of Reasons (ISR) in support of the proposed regulation, and stated that if it adopted the regulation, no cancer warnings would be required for exposure to the relevant chemicals in coffee.

---

[7] In the trial court, respondents unsuccessfully sought a stay of the remedies phase of trial pending the Agency's adoption of the proposed regulation. Respondents then sought and obtained a stay from this court.

11

In the ISR, the Agency noted, "Coffee is . . . unusual because it has been the subject of very high scientific interest for many years -- IARC reviewed more than 1000 observational and experimental studies investigating the potential carcinogenicity of coffee in humans and animals." It explained, "Coffee is unique in that it shows reductions in certain human cancers, has not been shown to increase any cancers, and is particularly rich in cancer chemopreventive compounds." The ISR listed antioxidants, anti-inflammatory chemicals, and soluble and insoluble fiber as "constituents that exhibit cancer chemopreventive properties," and cited numerous articles published in scientific journals to support its position regarding these categories of coffee constituents.

## 2. Public Comments and the 2005 Report

During the public comment period, the Agency received numerous submissions and held a public hearing, at which it received oral comments. Some commentors contended that the Agency should assess the cancer risk from acrylamide in coffee in isolation, without consideration of coffee as a mixture. CERT objected, inter alia, that the Agency had failed to consider and address its own 2005 report regarding acrylamide intake in various foods and beverages.

The 2005 report was prepared in support of a proposed regulation that was subsequently withdrawn. According to the report, its purpose was to "assist the public and the regulated community in estimating average daily intake of acrylamide from specific foods, and to inform the

12

development and content of regulations proposed by OEHHA
. . . ." Based on various data, the report estimated coffee
drinkers' daily intake of acrylamide from coffee, and
concluded that coffee was a substantial source of exposure to
acrylamide, and that drinkers likely exceeded the previously
set "No Significant Risk Level" (NSRL) for acrylamide. The
NSRL represents a safe harbor that protects businesses from
liability relating to exposure to a listed chemical under Prop.
65. If the level of exposure from a product is below the
NSRL, the safe harbor is triggered, and no warning is
required. (Cal. Code Regs., tit. 27, § 25705.)

### 3. The Agency's Modification of the Proposed Regulation

On March 15, 2019, the Agency announced it was
modifying its proposed regulation to limit the exempted
exposures to chemicals listed as of that date. The modified
proposed regulation therefore provided: "Exposures to
chemicals in coffee, listed on or before March 15, 2019 as
known to the state to cause cancer, that are created by and
inherent in the processes of roasting coffee beans or brewing
coffee do not pose a significant risk of cancer."

### 4. The Agency's Final Statement of Reasons and Adoption of the Regulation

Following the comment period, the Agency issued a
lengthy Final Statement of Reasons (FSR), which responded
to public comments and concluded that the available

scientific information supported the regulation. The Agency explained that because extensive research suggested that coffee, as a mixture, posed no significant risk of cancer, the individually listed chemicals formed through the roasting and brewing process also posed no significant risk of cancer when combined and consumed in the mixture. The FSR listed "[the Agency]'s key overall considerations in adopting this regulation":

> "'[1] There is inadequate evidence for the carcinogenicity of drinking coffee, based on a very large number of human studies.
>
> "'[2] There are inverse associations—decreasing risk with increasing coffee consumption - for human cancers of the liver and uterine endometrium.
>
> "'[3] There is inadequate evidence of increased carcinogenicity in animals administered coffee in controlled experiments.
>
> "'[4] There are inverse associations in a number of animal experiments and the overall evidence from animal studies is that of reduced incidence or reduced multiplicity of cancers with coffee intake.
>
> "'[5] There is a rich mix of cancer-preventative agents in brewed coffee.'"

(Fns. omitted.)

14

Relying in part on the IARC Monograph, the FSR repeatedly noted the IARC's conclusion that coffee was "'not classifiable as to its carcinogenicity to humans.'" While the IARC Monograph featured prominently in the FSR, the Agency did not merely adopt its conclusions, and explained that the Agency's determination regarding the risk of cancer from coffee was "strongly supported by the extensive research evaluated and summarized by IARC and by [the Agency]'s evaluation of the IARC Monograph and studies published subsequent to the IARC review . . . ."

In its FSR, the Agency did not expressly address CERT's objection that it had failed to consider the 2005 report and its conclusion that coffee drinkers exceeded the NSRL for acrylamide. However, in addressing the comments urging the Agency to examine the risk from acrylamide in coffee in isolation, it explained that given the large volume of research regarding the cancer risk from coffee as a mixture, it was appropriate to assess the evidence relating to the mixture as a whole, and explained that "reliance on a single carcinogenic constituent to infer significant risk can result in a substantial mischaracterization of the risk profile." In June 2019, the Office of Administrative Law approved the Coffee Regulation (as modified in March 2019).

*E. Respondents' Assertion of the Regulation as a Defense, and the Motions for Summary Adjudication and Summary Judgment*

Following the Agency's adoption of the Coffee Regulation, respondents moved to amend their answers to add the regulation as an affirmative defense, and the trial court granted them leave to do so. CERT then filed several motions for summary adjudication, attacking the validity of the Coffee Regulation on various grounds. In turn, respondents moved for summary judgment based on the regulation.[8]

Following hearings, the trial court denied CERT's motions for summary adjudication and granted respondents' motion for summary judgment, rejecting CERT's challenges to the Coffee Regulation's validity. Addressing CERT's contention that issues remained regarding acrylamide resulting from additives in some of respondents' coffee products, the court concluded such claims were outside the scope of CERT's actions, based, inter alia, on the allegations in its pre-suit notices and complaints.

---

[8]     While these motions were pending, CERT served respondents with document requests, seeking information relating to additives included in some coffee products. It then moved for a continuance to conduct additional discovery regarding this issue. The trial court did not expressly address CERT's motion, but as discussed below, in granting summary judgment for respondents, it ruled that claims relating to coffee additives were outside the scope of CERT's actions.

16

*F. CERT's Motion for Attorney Fees*

After the entry of judgment, CERT moved to recover attorney fees from 18 of the respondents under Code of Civil Procedure section 1021.5.  Acknowledging it had lost its case on the merits in the trial court, CERT claimed it was nevertheless a successful party entitled to fees under the "'catalyst theory,'" asserting that its litigation efforts had caused the relevant respondents to provide Prop. 65 warnings voluntarily during the litigation period.[9]

The trial court denied CERT's motion, concluding it was not a successful party eligible for fees even under the catalyst theory, as it had lost its case on the merits.  The court determined, alternatively, that CERT was not eligible for fees because it had not conferred a significant benefit on the public, as any warnings given during the pendency of its actions "were ultimately proven unnecessary for public health" under the Coffee Regulation.

*G. The Award of Costs under Section 998*

As discussed more fully below, during the litigation, the section 998 respondents served statutory offers of compromise on CERT, which rejected the offers.  After entry

---

[9]     "Under the catalyst theory, attorney fees may be awarded even when litigation does not result in a judicial resolution if the defendant changes its behavior substantially because of, and in the manner sought by, the litigation."  (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 560.)

of judgment, these respondents filed memoranda of costs seeking to recover their post-offer costs. CERT moved to tax costs, challenging the validity of the section 998 offers, but the trial court denied its motion and awarded the requested costs. This appeal followed.

## DISCUSSION

CERT challenges the trial court's grant of summary judgment, its denial of attorney fees to CERT, and its award of costs to the section 998 respondents. We conclude the trial court properly granted summary judgment and properly denied CERT's motion for fees. However, we agree with CERT that the court erred in awarding the relevant respondents costs under section 998.

### A. Summary Judgment

CERT claims the trial court erred in granting summary judgment for respondents and denying its motions for summary adjudication, because (1) the Coffee Regulation, on which the court's order rested, was invalid, and (2) even assuming the regulation was valid, triable issues remained regarding acrylamide from coffee additives. As discussed below, we find neither contention persuasive.

### 1. Standards of Review

#### a. Summary Judgment

We review the trial court's rulings on CERT's motions for summary adjudication and respondents' motion for summary judgment de novo.  (*Gresher v. Anderson* (2005) 127 Cal.App.4th 88, 96.)  A motion for summary judgment or summary adjudication is properly granted if the moving papers establish that there is no triable issue of material fact, and the moving party is entitled to judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.)

#### b. Administrative Regulations

The Agency adopted the coffee regulation under its authority to "adopt and modify regulations . . . as necessary to conform with and implement [Prop. 65]."  (Health & Saf. Code, § 25249.12, subd. (a).)  A regulation adopted pursuant to a delegation of lawmaking power has "the dignity of statutes."  (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 10.)  "When a court assesses the validity of such rules, the scope of its review is narrow.  If satisfied that the rule in question lay within the lawmaking authority delegated by the Legislature, and that

it is reasonably necessary to implement the purpose of the statute, judicial review is at an end."[10]  (*Id.* at 10-11.)

Our review of whether a regulation is reasonably necessary is limited to "whether the rule is arbitrary, capricious, or without rational basis [citation] and whether substantial evidence supports the agency's determination that the rule is reasonably necessary."  (*Western States Petroleum Assn. v. Board of Equalization* (2013) 57 Cal.4th 401, 415.)  Under this standard, the challenged regulation is presumptively valid, and the burden is on the party challenging it to show that it is infirm.  (*Tomlinson v. Qualcomm* (2002) 97 Cal.App.4th 934, 940-941.)  In the absence of an arbitrary and capricious decision, we will defer to the agency's expertise (*Ford Dealers Assn. v. Department of Motor Vehicles* (1982) 32 Cal.3d 347, 355), and "will not . . . venture into an independent determination of the wisdom of the challenged regulation" or "substitute our judgment for that of the agency with respect to such things as the existence and weight to be accorded the facts and policy considerations . . . ."  (*Western States Petroleum Assn. v. State Dept. of Health Services* (2002) 99 Cal.App.4th 999, 1007.)

---

[10]    While CERT suggests these principles are inapplicable to an indirect challenge to the validity of a regulation in the context of summary judgment, it cites no relevant authority for this proposition, and we are aware of none.

2. *Analysis*

CERT challenges the regulation on multiple grounds, asserting: (1) the Agency failed to explain its departure from the prior position it expressed in the 2005 report; (2) the Agency's FSR failed to address CERT's objection based on the claimed departure; (3) the regulation is underinclusive and thus is not supported by its rationale; and (4) the regulation is scientifically unsupported. We address these contentions in turn.

a. There Was No Conflict Between the Regulation and the 2005 Report

Citing federal caselaw applying the federal Administrative Procedures Act, CERT contends that an agency adopting a regulation contrary to its prior conclusions must acknowledge and explain the departure. Assuming, without deciding, that such a requirement exists under California law, we conclude it would have no application here, because the Coffee Regulation was not contrary to the Agency's 2005 report.

As noted, the 2005 report was a technical document dealing with the intake levels of acrylamide in different foods and beverages. Its purpose was to "assist the public and the regulated community in estimating average daily intake of acrylamide from specific foods, and to inform the development and content of regulations proposed by OEHHA . . . ." The report concluded that coffee drinkers likely

exceeded both the NSRL for acrylamide, and that coffee was a substantial source of exposure to acrylamide.

Contrary to CERT's suggestion, the conclusion that coffee drinkers exceeded the NSRL for acrylamide did not encompass a determination that coffee drinking caused cancer. As explained above, the NSRL provides a safe harbor. That an exposure level exceeds the NSRL does not imply it presents a significant risk of cancer. "In [the Agency]'s words, its establishment of a[n] NSRL 'expressly is not a determination that any level above the NSRL poses a significant risk.'" (*Baxter Healthcare Corp. v. Denton* (2004) 120 Cal.App.4th 333, 358.) These safe harbor levels do not preclude the use of alternative levels that can be demonstrated to be safe. (See Cal. Code Regs., tit. 27, § 25701, subd. (a) ["Nothing in this article shall preclude a person from using evidence, standards, risk assessment methodologies, principles, assumptions or levels not described in this article to establish that a level of exposure to a listed chemical poses no significant risk"].)

The 2005 report included no independent risk assessment and did not address whether coffee caused cancer or whether any cancer risk inherent in coffee drinking should be assessed based on the mixture or its constituents. Thus, the Coffee Regulation's determination that exposure to acrylamide inherent in coffee did not pose a significant risk of cancer contradicted nothing in the 2005

22

report, and there was therefore no change of position calling for any explanation.[11]

### b. The Agency Substantially Complied with Its Duty to Address CERT's Objections

#### i. Governing Principles

Under the California Administrative Procedures Act (APA), before adopting a proposed regulation, an agency must provide an FSR that includes, among other things, a summary of "each objection or recommendation made regarding the [proposed regulatory action], together with an explanation of how the proposed action has been changed to accommodate each objection or recommendation, or the reasons for making no change." (Gov. Code, § 11346.9, subd. (a)(3).) An agency's "substantial failure" to comply with the APA's requirements may result in the regulation's invalidation. (Gov. Code, § 11350, subd. (a).)

Construing the phrase "substantial failure" in the APA, the court in *Sims v. Department of Corrections & Rehabilitation* (2013) 216 Cal.App.4th 1059 (*Sims*) relied on the concept of "[s]ubstantial compliance," which it described as "the counterpart, or obverse, of the substantial failure to comply, which negatively expresses the same idea." (*Id.* at

---

[11]    As discussed below, the Agency sufficiently explained its decision to forgo a quantitative assessment of coffee's constituents in favor of a qualitative assessment of the mixture as a whole.

23

1073.)  "'[S]ubstantial compliance . . . means actual compliance in respect to the substance essential to every reasonable objective of the statute.  But when there is such actual compliance as to all matters of substance[,] then mere technical imperfections of form . . . should not be given the stature of noncompliance . . . .'"  (*Id.* at 1073, quoting *Stasher v. Harger-Haldeman* (1962) 58 Cal.2d 23, 29.)

### ii.  Application

Although the Agency did not expressly address CERT's objection that it had failed to consider the 2005 report's conclusion that coffee drinkers exceeded the NSRL for acrylamide, it sufficiently addressed the substance of the objection by explaining its rejection of a quantitative NSRL like the one employed in the report.  The Agency thus did not substantially fail to comply with the APA's requirements.

As noted, the Agency addressed comments claiming that cancer risk from acrylamide in coffee should be assessed in isolation, without consideration of coffee as a mixture.  It explained that given the large volume of research concerning the cancer risk from coffee as a mixture, it was appropriate to assess the evidence relating to the mixture as a whole, and stated that "reliance on a single carcinogenic constituent to infer significant risk can result in a substantial mischaracterization of the risk profile."  That the Agency addressed the substance of CERT's concern without expressly referencing the 2005 report constituted, at most, a "'mere technical imperfection[] of form,'" which will not

24

invalidate a regulation.[12]  (*Sims*, *supra*, 216 Cal.App.4th at 1073.)

>             c.  The Coffee Regulation is Consistent with
>                 the Agency's Rationale

Contrary to CERT's contention, the Coffee Regulation is consistent with the rationale offered by the Agency.  In adopting the regulation, the Agency explained that because extensive research suggested that coffee, as a mixture, posed no significant risk of cancer, the individual listed chemicals formed through the roasting and brewing process also posed no significant risk of cancer when combined and consumed in the mixture.  We see nothing inconsistent or illogical in this rationale.

CERT notes that the regulation applies only to chemicals listed on or before March 15, 2019, and argues it is

---

[12]     Any technical noncompliance by the Agency in failing to expressly reference the 2005 report is a far cry from the substantial failures in the cases CERT cites in support of its position.  (See *Sims*, *supra*, 216 Cal.App.4th at 1074 [California Department of Corrections and Rehabilitation violated APA by: failing to set forth alternatives to its proposed lethal injection protocol, failing to explain rejection of various alternatives, falsely representing how it selected proposed method, failing to include required documents in rulemaking file, and failing to make file publicly available in timely manner]; *Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 133 [noting Office of Administrative Law's disapproval of regulatory action where agency's final statement of reasons failed to include *any* summary and response to public comments].)

arbitrary and capricious because "[i]f [the Agency's] rationale for the regulation were true and valid, there would be no basis for excluding unlisted carcinogens from the scope of the regulation" because "unlisted carcinogens in coffee could no more present a significant risk of cancer . . . than could listed carcinogens." But "regulations are 'not invalid merely because they are to some extent underinclusive or overinclusive . . . .'" (*State Farm General Insurance Company v. Lara* (2021) 71 Cal.App.5th 148, 183.) The Agency was entitled to address currently listed chemicals first, saving for another day any chemicals inherent in the roasting and brewing of coffee that might be listed in the future. (See *ibid.*; *Western States Petroleum Assn. v. Board of Equalization*, *supra*, 57 Cal.4th at 421 [regulation that singled out petroleum refineries, even though its rationale applied to other types of industrial facilities as well, was not arbitrary and capricious]; cf. *U.S. Cellular Corp. v. F.C.C.* (D.C. Cir. 2001) 254 F.3d 78, 86 ["agencies need not address all problems 'in one fell swoop,'" and "'[r]eform may take place one step at a time, addressing itself to the phase of the problem which seems most acute to the [regulatory] mind'"].) The regulation is therefore consistent with its rationale.

### d. CERT Has Not Shown That the Coffee Regulation Lacks Scientific Foundation

CERT claims the regulation lacks scientific foundation for several reasons. It contends: (1) *Lockheed Litigation Cases* (2004) 115 Cal.App.4th 558 (*Lockheed*) held that IARC

26

monographs are insufficiently reliable; (2) the IARC is not an authoritative body for cancer risk assessment; (3) the Agency misrepresented the IARC's conclusions in various ways; and (4) the Agency relied in part on an unsupported finding that antioxidants in coffee had an anti-carcinogenic effect. We find none of these contentions convincing.

First, CERT cites *Lockheed* for the proposition that an IARC monograph regarding a chemical mixture is scientifically unreliable for purposes of determining human cancer risk from a chemical within the mixture. *Lockheed* is inapposite. There, the court held that an expert could not reasonably opine that exposure to five particular chemicals caused cancer based on an IARC study that found that "painters who potentially were exposed to a long list of more than 130 substances and thousands of chemical compounds contracted cancer" at a higher rate. (*Lockheed, supra*, 115 Cal.App.4th 558, 564-565.) The court explained that the expert's opinion was "based on conjecture and speculation as to which of the many substances to which the study subjects were exposed contributed to the greater incidence of cancer." (*Id.* at 565.) This analysis has no application here, where the IARC Monograph evaluated the very mixture addressed by the Coffee Regulation, and tended to negate a substantial risk of cancer from it. While the IARC Monograph provides no basis for determining the cancer risk from an individual constituent of coffee, like acrylamide, in isolation, the Coffee Regulation rests on the Agency's conclusions regarding the

27

risk of cancer from coffee as a mixture -- a conclusion the Monograph tends to support.

Second, CERT complains that "while IARC is an authoritative body for the identification of chemicals as to their carcinogenicity to humans (i.e., cancer hazard assessment), it is not recognized as an authoritative body for quantifying risks of cancer from carcinogens (i.e., cancer risk assessment)." CERT fails to explain the significance of this distinction for purposes of the Agency's reliance on the IARC Monograph. As the Monograph itself explains, "[m]onographs represent the first step in carcinogenic risk assessment," and they "identify cancer hazards even when risks are very low at current exposure levels." The Agency therefore reasonably relied on the IARC's findings regarding coffee's carcinogenicity and its Monograph's conclusion that coffee was "not classifiable as to its carcinogenicity." (Italics omitted.)

Third, CERT claims that in various ways, the Agency's FSR gave a "false impression" that the IARC had concluded coffee does not cause cancer, when in fact the Monograph concluded only that there was inadequate evidence for coffee's carcinogenicity. We disagree. The Agency's FSR quoted multiple times the IARC's overall conclusion that coffee was "'not classifiable as to its carcinogenicity to humans.'" CERT points to the FSR's statement of the Agency's key considerations in adopting the regulation, and complains that it presents the IARC's conclusions in a misleading manner because of its wording, its use of the

phrase "'inadequate evidence'" without providing the IARC's definition for the phrase, and its omission of relevant context from the IARC Monograph. However, the FSR's statement of key considerations represented the Agency's conclusions, rather than those of the IARC. Indeed, the Agency explained that its determination regarding the risk of cancer from coffee relied on its own evaluation of the Monograph, the underlying research summarized by the Monograph, and "studies published subsequent to the IARC review . . . ."

Finally, CERT challenges the FSR's assertion that "[t]here is a rich mix of cancer-preventative agents in brewed coffee." CERT speculates that this statement "apparently refers to antioxidants in coffee" and proceeds to contest the notion that antioxidants in coffee prevent cancer. Initially, there is no reason to think that the FSR's reference to cancer-preventative agents was limited to antioxidants. In its ISR, the Agency listed anti-inflammatory chemicals as well as soluble and insoluble fiber, alongside antioxidants, as "constituents that exhibit cancer chemopreventive properties . . . ." The ISR cited numerous articles published in scientific journals to support its position that these categories of coffee constituents possessed anticarcinogenic properties. The Agency's FSR referenced the ISR's discussion of cancer-preventative agents and noted its citation to multiple scientific authorities in support of its conclusions.[13]

_____

[13]   CERT's contention that the Agency relied on a single article is therefore incorrect.

29

Moreover, we decline CERT's invitation to wade into a scientific debate about the effects of antioxidants in coffee or the quality of the studies on which the Agency relied in adopting the Coffee Regulation. Our task is to assess only whether the Agency's adoption of the regulation was arbitrary or capricious. We may not "substitute our judgment for that of the agency" regarding "the existence and weight to be accorded the facts and policy considerations that support the regulation." (*Western States Petroleum v. State Dept. of Health Services, supra,* 99 Cal.App.4th at 1007.) In short, the regulation does not lack scientific foundation.

### e. Claims Regarding Acrylamide from Additives Are Beyond the Scope of CERT's Actions

CERT's claims regarding acrylamide formed by the roasting of plant roots, nuts, and seeds added to coffee -- which are not addressed by the Coffee Regulation -- exceeded the scope of CERT's actions, as delineated by its pre-suit notices. These claims therefore did not preclude summary judgment.

Before bringing a Prop. 65 action in the public interest, a private plaintiff must provide a pre-suit notice containing sufficient information about the claim to (1) the Attorney General and other public prosecutors, to allow them to adequately investigate the claim's basis, and (2) the alleged violator, to allow it an opportunity to cure the

30

violation.  (See Health & Saf. Code, § 25249.7, subd. (d); *Consumer Advocacy Group, Inc. v. Kintetsu Enterprises of America* (2007) 150 Cal.App.4th 953, 960-961 (*Consumer Advocacy Group*).)  This pre-suit notice must describe, among other things, "the specific type of consumer product . . . with sufficient specificity to inform the recipients of the nature of the items allegedly sold in violation of the law and to distinguish those products . . . from others sold . . . ." (Cal. Code Regs., tit. 27, § 25903, subd. (b)(2)(D).)  Failure to comply with pre-suit notice requirements is grounds for dismissal, and deficiencies cannot be cured after the complaint is filed.  (See *Physicians Committee for Responsible Medicine v. KFC Corp.* (2014) 224 Cal.App.4th 166, 181 (*Physicians Com.*).)

It is undisputed that CERT's pre-suit notices failed to distinguish regular coffee from a subset of coffee with additives from plant roots, nuts, or seeds, and made no mention of acrylamide from such additives as the basis of any violation.  Indeed, CERT alleged that "[e]xposures to acrylamide unavoidably occurred via ingestion *whenever* a consumer purchased and thereafter consumed" the alleged violators' "coffee" or "ready-to-drink coffee."  (Italics added.) This description provided no notice to respondents or public prosecutors that CERT's claim targeted a subset of products containing coffee additives -- to which consumers were not exposed "whenever" they purchased respondents' coffee -- and thus that they should investigate the existence and

31

carcinogenicity of acrylamide produced from the roasting of such additives.

CERT argues: "whether or not acrylamide-containing additives were mentioned in CERT's pre-suit notices of violations, . . . acrylamide-containing additives became relevant to this case when [respondents] were granted leave to amend their answers to assert the Coffee Regulation, because that regulation does not exempt from liability companies that expose Californians to acrylamide-containing additives." According to CERT, "to obtain summary judgment on their new defense, [respondents] were obliged to prove that defense *applied* to their products," and thus, respondents "had to offer evidence that their coffee products did not contain any acrylamide-containing flavorings or other additives."

CERT's argument ignores its pre-suit notice obligations. As noted, to allow alleged violators and public prosecutors to investigate claims, pre-suit notices must identify the specific type of consumer product, with sufficient specificity to distinguish it from others. (See Cal. Code Regs., tit. 27, § 25903, subd. (b)(2)(D); *Consumer Advocacy Group, supra,* 150 Cal.App.4th at 960-961.) That respondents' defense precluded liability based on the broad category CERT identified in its notices does not excuse CERT from complying with this requirement. Under CERT's approach, private plaintiffs would be able to cast a wide net, identifying vast categories of products in hopes of catching *something* that would support a violation, and

32

adjusting their claims according to developments in the litigation. This approach is contrary to Prop. 65's intent to allow pre-suit investigation of alleged violations. Accordingly, we conclude that CERT's broad and undifferentiated identification of "coffee" in its pre-suit notices prevents it from now pointing to a subset of coffee with additives from plant roots, nuts, and seeds as the basis for respondents' liability.[14] (See *Consumer Advocacy Group*,

---

[14] Given our conclusion, we need not address CERT's additional contention that the trial court erred by failing to grant it a continuance to conduct additional discovery regarding coffee additives. In its reply brief, CERT argues for the first time that epidemiological studies of acrylamide in food are scientifically unreliable, citing an expert declaration filed by the Attorney General in a different case in January 2020 (after the Agency issued the Coffee Regulation but before the filing of CERT's opening brief). Similarly, for the first time in its answer to the Agency's amicus brief, CERT contends that the Agency adopted the Coffee Regulation due to political pressure, and that its rationale was simply a post hoc rationalization that cannot support the regulation. CERT has forfeited these contentions by failing to raise them in its opening brief. (See *Tukes v. Richard* (2022) 81 Cal.App.5th 1, fn. 5 ["A contention not appropriately raised in the opening brief under a separate argument heading may be deemed forfeited."])

Because we affirm the grant of summary judgment based on the Agency's regulation and the conclusion that claims involving additives were outside the scope of CERT's actions, we need not address respondents' alternative argument that compelling them to provide Prop. 65 warnings would have violated the First Amendment.

33

*supra*, at 960-961; *Physicians Com.*, *supra*, 224 Cal.App.4th at 181.)

### B. Attorney Fees

CERT contends the trial court abused its discretion in denying its motion for attorney fees. It argues, among other things, that it conferred a significant benefit on the public, contrary to the trial court's determination, because the voluntary, temporary Prop. 65 warnings posted by some respondents provided an "informational benefit." As explained below, in light of the Agency's determination that coffee poses no significant risk of cancer, we conclude CERT has shown no benefit from these temporary warnings.[15]

### 1. Applicable Law

#### a. Eligibility for Fees under Code of Civil Procedure Section 1021.5

"[Code of Civil Procedure] [s]ection 1021.5 codifies the 'private attorney general' doctrine of attorneys fees

---

[15] We also question whether CERT could be deemed a successful party under the catalyst theory after litigating and losing its case on the merits. (See *Skaff v. Rio Nido Roadhouse* (2020) 55 Cal.App.5th 522, 540 ["we are not convinced that the catalyst theory should even apply here," as "[t]he catalyst theory is generally not invoked in cases where the merits have been fully litigated to a final judgment"].) However, because we conclude that CERT conferred no significant benefit on the public, we need not decide the issue.

articulated in *Serrano v. Priest* (1977) 20 Cal.3d 25 . . . and other judicial decisions." (*Flannery v. California Highway Patrol* (1998) 61 Cal.App.4th 629, 634.) "The statute gives the trial court discretion to award fees to a successful party if (1) its action has resulted in the enforcement of an important public right, (2) the general public or a large class of persons has received a significant benefit, (3) the burden of private enforcement is disproportionate to the litigant's personal interest, and (4) it is unfair to make a successful plaintiff pay the fees out of any recovery." (*Concerned Citizens of La Habra v. City of La Habra* (2005) 131 Cal.App.4th 329, 334 (*Concerned Citizens*).)

"The award of fees under section 1021.5 is an equitable function, and the trial court must realistically and pragmatically evaluate the impact of the litigation to determine if the statutory requirements have been met. [Citation.] This determination is 'best decided by the trial court, and the trial court's judgment on this issue must not be disturbed on appeal "unless the appellate court is convinced that it is clearly wrong and constitutes an abuse of discretion." [Citations.]'" (*Concerned Citizens, supra*, 131 Cal.App.4th at 334.)

2. Analysis

CERT has shown no benefit to the public from the temporary warnings provided, let alone an abuse of discretion in the trial court's conclusion that no benefit had been conferred. CERT contends it conferred an

informational benefit in accord with Prop. 65's purposes by advising consumers that the coffee contained a carcinogen and allowing them to make informed decisions regarding their coffee consumption. However, the Coffee Regulation, promulgated by the agency responsible for implementing Prop. 65, establishes that those warnings were unnecessary and misleading regarding the risk of cancer from coffee. The warnings therefore provided no informational benefit to consumers. (Cf. *Dowhal v. SmithKline Beecham Consumer Healthcare* (2004) 32 Cal.4th 910, 934 (*Dowhal*) ["a truthful warning of an uncertain or remote danger may mislead the consumer into misjudging the dangers stemming from use of the product, and consequently making a medically unwise decision"]; *Nicolle-Wagner v. Deukmejian* (1991) 230 Cal.App.3d 652, 661 (*Nicolle-Wagner*) [avoiding warnings regarding substances that pose insignificant risk of cancer "will further the statutory purpose [of Prop. 65] in safeguarding the effectiveness of warnings which are given"].)

CERT argues that the warnings were required at the time they were posted, before the Coffee Regulation was issued, and suggests that its suit conferred a benefit by enforcing the law at the time. But even assuming that Prop. 65 warnings for coffee were required before the Agency adopted the Coffee Regulation -- a matter we do not decide -- enforcement of the law does not necessarily confer a significant benefit on the public. "Of course, the public always has a significant interest in seeing that legal

36

strictures are properly enforced and thus, in a real sense, the public always derives a 'benefit' when illegal private or public conduct is rectified. Both the statutory language ('significant benefit') and prior case law, however, indicate that the Legislature did not intend to authorize an award of attorney fees in every case involving a statutory violation. [Rather,] the Legislature contemplated that in adjudicating a motion for attorney fees under section 1021.5, a trial court would determine the significance of the benefit, as well as the size of the class receiving benefit, from a realistic assessment, in light of all the pertinent circumstances, of the gains which have resulted in a particular case." (*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 939-940; accord, *Villarreal v. Gordon* (2019) 44 Cal.App.5th 233, 240.) Given that the warnings in this case *disserved* Prop. 65's purpose to inform the public of significant cancer risks (see *Dowhal, supra,* 32 Cal.4th at 934; *Nicolle-Wagner*, *supra*, 230 Cal.App.3d at 661), they provided no significant benefit for purposes of the attorney fees statute. Accordingly, the trial court properly denied CERT's motion for attorney fees.

### C. Section 998 Costs

CERT contends the section 998 respondents' compromise offers were invalid because: (1) settlement offers in Prop. 65 cases can never be valid under section 998, as they require court approval; and (2) the relevant respondents' offers included overly broad releases.

37

Assuming, without deciding, that section 998 applies to Prop. 65 claims, we agree that the offers here were invalid because they included overly broad releases. Accordingly, we reverse the trial court's denial of CERT's motion to tax costs.

### 1. Background

During the litigation, the section 998 respondents served CERT with statutory offers to compromise. Under the terms of the offers, these respondents were to pay CERT substantial amounts and post Prop. 65 warnings, with certain conditions. In return, CERT was to provide two kinds of releases. The first was a public release, requiring CERT, as a plaintiff suing "in the public interest," to release the offerors from "all claims . . . as to any alleged violation of Proposition 65 that is or that could have been asserted in the [pre-suit] Notice or [complaint] based on the facts alleged therein." The second release applied to CERT in "its individual capacity," and required it to provide "a general release" of "all [c]laims of CERT . . . of any nature, character or kind, known or unknown, suspected or unsuspected, arising under Proposition 65 or for an alleged failure to provide warnings for exposures to acrylamide." CERT rejected these compromise offers.

After entry of judgment, the section 998 respondents filed memoranda of costs seeking to recover almost $700,000 in post-offer costs. CERT moved to tax costs, challenging the validity of the statutory compromise offers and arguing,

38

inter alia, that the releases included in the offers were overly broad because they applied to claims outside the scope of the litigation "such that there would be no way to determine whether a judgment in the pending action is 'more favorable' than the value of those claims." The trial court denied CERT's motion and awarded the requested post-offer costs.[16]

### 2. Applicable Law

"On a motion to strike or tax costs, '[t]he burden is on the offering party to demonstrate that the offer is valid under section 998.' [Citations.] 'The offer must be strictly construed in favor of the party sought to be bound by it.' [Citations.] '"We independently review whether a section 998 settlement offer was valid. In our review, we interpret any ambiguity in the offer against its proponent."'" (*Khosravan v. Chevron Corp.* (2021) 66 Cal.App.5th 288, 294-295.)

Under section 998, "any party may serve an offer in writing upon any other party to the action to allow judgment to be taken or an award to be entered in accordance with the terms and conditions stated at that time." (§ 998, subd. (b).) "If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment," the plaintiff must "pay the defendant's costs from the time of the offer," and the court has discretion to "require the plaintiff to

---

[16] On appeal, CERT has not provided a reporter's transcript of the hearing on its motion to tax.

39

pay a reasonable sum to cover postoffer costs of the services of expert witnesses . . . ." (§ 998, subd. (c)(1).)

Because section 998 requires a determination whether the offer's terms were more favorable than the judgment, the offer must not include a release of claims beyond those involved in the litigation. (*Ignacio v. Caracciolo* (2016) 2 Cal.App.5th 81, 86-87 (*Ignacio*); see *id.* at 87 ["Requiring resolution of potential unfiled claims not encompassed by the pending action renders the offer incapable of valuation"].) Thus, in *Ignacio*, the court held a section 998 offer invalid because it went "well beyond the scope of the litigation," requiring the release of "'any and all claims' the releasees may have against the releasors 'whether now known or unknown, suspected or unsuspected, that have existed or may have existed or which do exist, or which hereinafter can, shall or may exist . . . .'" (*Ignacio, supra,* at 89.) The *Ignacio* court noted that the plaintiff-offeree had identified before the trial court a claim that was not involved in the pending litigation but would have been encompassed by the release. (*Id.* at 90.) Because the proposed release of extraneous claims made the offer incapable of valuation, the court concluded the offer was invalid for purposes of section 998. (*Ignacio, supra,* at 87, 89-90.)

Similarly, in *Chen v. Interinsurance Exchange of the Automobile Club* (2008) 164 Cal.App.4th 117 (*Chen*), the court deemed an offer invalid because it required a "'general release of all claims.'" (*Id.* at 122.) The court reasoned that the required release was at least ambiguous as to whether it

40

applied to a pending insurance claim outside the scope of the litigation, rendering the offer incapable of valuation. (*Id.* at 122-123.)

### 3. Analysis

The individual-capacity general releases included in the section 998 respondents' compromise offers were overly broad, as they encompassed claims beyond the scope of this litigation. As noted, those releases would have applied to "all Claims . . . known or unknown . . . arising under Proposition 65 or for an alleged failure to provide warnings for exposures to acrylamide." While the release would have applied only to Prop. 65 claims, the section 998 respondents point to nothing in their language that would have limited them to the claims involved in CERT's actions, and we see no such limitation. Because the releases extended beyond the scope of the litigation, they invalidated the compromise offers. (See *Ignacio, supra*, 2 Cal.App.5th at 86-87; *Chen, supra*, 164 Cal.App.4th at 122.)

The section 998 respondents argue the general releases did not invalidate their statutory compromise offers for four reasons. First, they note that during the litigation, CERT approved other defendants' section 998 offers containing the same releases. Citing no authority, the section 998 respondents argue, "The fact that such releases were standard for CERT . . . supports the conclusion that CERT was not prejudiced by such provisions, and that they were an appropriate part of a proposed consent judgment under

41

Proposition 65." However, the relevant question under section 998 is whether the offers allowed for a determination that the judgment was more favorable, not whether the offers "prejudiced" the offeree. Regardless of whether CERT accepted other flawed section 998 offers, these respondents' offers required *the court* to engage in an impracticable valuation of potential claims outside the scope of the litigation, and were therefore invalid. (See *Ignacio*, *supra*, 2 Cal.App.5th at 87; *Chen*, *supra*, 164 Cal.App.4th at 122-123)

Second, the section 998 respondents state that under *Goodstein v. Bank of San Pedro* (1994) 27 Cal.App.4th 899 (*Goodstein*), a valid statutory compromise offer may include a general release. In *Goodstein*, however, the court concluded that a "general release" did not invalidate a statutory compromise offer after construing it to apply only to the litigation before it. (*Goodstein* at 907; accord, *Ignacio*, *supra*, 2 Cal.App.5th at 89 ["The rule to be taken from *Goodstein* is not that a 'general release' does not invalidate a section 998 offer; the rule is that a release of unknown claims arising only from the claim underlying the litigation itself does not invalidate the offer"].) We cannot similarly construe the releases here, which applied to "all [c]laims . . . under Prop. 65."

Third, the section 998 respondents contend that to establish that a release was overbroad, the offeree must identify a potential claim that would have been encompassed by the release but is beyond the scope of the litigation. They contend CERT failed to do so, both in the trial court and on

42

appeal. Assuming arguendo that such a requirement exists, no special effort is needed to identify a qualifying potential claim in this case. As discussed above, and as these respondents themselves argue in the context of summary judgment, CERT's asserted claim involving exposure to acrylamide formed by additives in coffee was beyond the scope of its actions. Yet under the terms of the proposed general releases, this claim -- undoubtedly a claim under Prop. 65 -- would have been relinquished.[17]

Finally, the section 998 respondents claim their offers, which included Prop. 65 warnings and substantial payments to CERT, "were clearly more favorable than the judgment of dismissal that CERT achieved." But this assertion ignores claims beyond the scope of CERT's actions that were to be released under the offers. The asserted claim involving

---

[17] The section 998 respondents suggest that CERT forfeited its arguments by failing to expressly identify a released claim beyond the scope of the litigation. To the extent this asserted failure triggers the forfeiture rule, we exercise our discretion to consider CERT's contentions and the claim we have identified because this matter is subject to de novo review and the relevant claim was extensively discussed both below and on appeal in the context of summary judgment, providing the section 998 respondents ample opportunity to address it. (See *Husman v. Toyota Motor Credit Corp.* (2017) 12 Cal.App.5th 1168, 1187 [noting appellate courts' discretion to consider matter that was not argued below but involves only legal question based on undisputed facts]; *Jameson v. Desta* (2009) 179 Cal.App.4th 672, 674, fn. 1 [exercising discretion to consider claim not raised in opening brief because respondent had not been deprived of opportunity to address issue].)

coffee additives was unaffected by the Coffee Regulation, and if found meritorious, could have yielded a significant reward for CERT, which would have been entitled to 25 percent of all penalties collected.[18]  Given that the proposed releases in the section 998 offers covered this and other potential claims, the trial court could not have determined that the offers were more favorable than the judgment.  Thus, the offers were invalid for purposes of section 998, and the trial court erred in denying CERT's motion to tax costs.

---

[18]    As noted, a person who violates Prop. 65 is subject to civil penalties of up to $2,500 per day for each violation.  (Health & Saf. Code, § 25249.7, subd. (b)(1).)

## DISPOSITION

The trial court's orders granting summary judgment and denying attorney fees are affirmed.  The order denying CERT's motion to tax costs is reversed.  The parties shall bear their own costs on appeal.

**CERTIFIED FOR PUBLICATION**


MANELLA, P. J.


We concur:


WILLHITE, J.


COLLINS, J.